Receipt number AUSFCC-11471697

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CLEAN WATER FUND,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | 26-1380 C |

**COMPLAINT**

Plaintiff, Clean Water Fund (CWF), for its complaint against defendant, the United States, alleges as follows:

1. This is a breach of contract suit seeking money damages incurred by CWF due to the Environmental Protection Agency's (EPA) unlawful and bad faith termination of a cooperative agreement between CWF and EPA under the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program (ECJ Program or ECJP).

2. Congress enacted the Inflation Reduction Act in 2022 and created the EJCP as a program under Section 138 of the Clean Air Act, 42 U.S.C. § 7438.

3. Congress appropriated $2.8 billion for EJCP grants to help disadvantaged communities address a wide range of environmental and climate justice issues.

4. The EJCP "provides funding to support community-based organizations in their efforts to collaborate and partner with local stakeholder groups (*e.g.*, local businesses and industry, local government, medical service providers, and academia) as they develop and implement solutions that address environmental and/or public health issues for underserved

communities." https://sam.gov/fal/31e38895c3974c15b0b63d20b7f5b35d/view, last visited March 11, 2026.

5. EPA entered into a binding EJCP cooperative agreement, Grant No. 84084301, on November 14, 2024, providing a grant that obligated $497,111.00 to build on current initiatives to build upon established relationships, prior educational campaigns on lead in drinking water, and collaborations with municipalities to remove lead service lines (LSLs) in Malden and Chelsea, Massachusetts and a focused campaign to provide the people of Philadelphia, PA with knowledge to know how to protect themselves from lead hazards. Exhibit (Cooperative Agreement).

6. CWF received the full amount to its Automated Standard Application for Payment (ASAP) account at the time of award.

7. As described in detail below, EPA unlawfully terminated the Cooperative Agreement based on an alleged change in agency priorities because that Agreement's terms at the time of award specifically prohibited unilateral terminations based on shifts in agency priorities. Moreover, EPA found authority for its termination solely in a regulatory provision promulgated after the award and, which possessed only prospective effect under its own terms.

8. Indeed, EPA unlawfully terminated the entire statutorily mandated ECJP. The United States District Court for the District of South Carolina has already ruled that the agency policy guidance cancelling the ECJP was contrary to law and arbitrary and capricious, something that the government conceded in that case. *Sustainability Inst. v. Trump*, No. 2:25-2152-RMG, 2026 WL 1694522, at *5 (D.S.C. June 11, 2026).

9. EPA's termination of CWF's Cooperative Agreement caused extensive harm not only to CWF and its employees, but also to the health, livelihood and economy of the communities that CWF's Cooperative Agreement was intended to protect from lead poisoning.

**PARTIES**

10. Plaintiff Clean Water Fund is a nonprofit organization under section 501(c)(3) of the U.S. Internal Revenue Code. Since 1974, CWF has helped people successfully campaign for cleaner air, cleaner and safer water, and protection from toxic pollution.

11. Defendant is the United States of America, acting through EPA—an independent agency within the Executive Branch of the United States government.

**JURISDICTION**

12. The Court possesses exclusive subject matter jurisdiction to entertain this breach of contract action pursuant to the Tucker Act, 28 U.S.C. § 1491.

13. This action is timely because all claims have accrued within the last six years. 28 U.S.C. § 2508.

14. CWF has standing to bring this action because it is suffered injury in fact caused by EPA's breach of its Cooperative Agreement, which is redressable in this Tucker Act breach of contract suit.

**BACKGROUND**

15. EPA published a Notice of Funding Opportunity (NOFO) on the System for Award Management (SAM) for the EJCP. *See* https://sam.gov/fal/31e38895c3974c15b0b63d20b7f5b35d/view, last visited March 11, 2026.

16. The program's purpose was to "develop and implement solutions that address environmental and/or public health issues for underserved communities." *Id*. The NOFO provided for grants in amounts between $150,000 and $500,000. *Id*.

17. On November 14, 2025, EPA awarded Grant No. 84084301 obligating $497,000.000, to CWF. This Cooperative Agreement provided funding for CWF to work with community partners to educate the public about lead hazards and advance the equitable removal of lead service lines in Massachusetts and to provide educational outreach to help the people of Philadelphia with the knowledge to protect themselves from lead hazards.

18. The anticipated deliverables included a report on issues surrounding lead exposure and LSL replacements through focus groups, multi-lingual educational outreach materials, presentations, workshops, events, evaluation, and reports of progress.

19. And the expected outcomes included (1) moving cities of Malden and Chelsea, MA significantly closer to eliminating all LSLs—which include further development of their LSL inventories, engagement with childcare facilities in LSL education and replacement; and launch of a Community Childhood Lead Exposure Reduction Program to educate residents about full range of lead exposure and engage them in action around one or more additional exposure sources; and (2) a community outreach campaign in Philadelphia, through the Clean Water Fund's Lead Hazard Awareness Program, that will empower residents to identify and live safely with lead poisoning hazards in their homes and communities.

20. At the time of award, the Cooperative Agreement's terms and conditions at page 2-3, allowed EPA to terminate the grant unilaterally only if the recipient "fails to comply with the terms and conditions of the award, including statutory or regulatory requirements" or

"[p]ursuant to the programmatic terms and conditions specified in the Federal award." The agreement did not allow termination due to shifting Executive Branch priorities. *Id.*

21. It was not until April 3, 2025, that EPA modified the terms and conditions of its grant agreements to include a new subparagraph 3(d), which allowed termination by "EPA or pass-through entity to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Importantly, EPA emphasized that it was limiting the effect if this provision to future agreements: "**This provision applies to all new awards and funding amendments (incremental and supplemental) made on or after April 3, 2025.**" *Id.* (emphasis in original).

22. Although EPA had limited its ability to terminate Cooperative Agreements unilaterally in both its October 1, 2024, and April 3, 2025, terms and conditions, on May 2, 2025, EPA purported to terminate the Cooperative Agreement solely because the "objectives of the award are no longer consistent with EPA funding priorities."

23. CWF has complied with all terms and conditions of the Cooperative Agreement.

24. The government has not contended that CWF has failed to comply with any term or condition of the Cooperative Agreement.

25. On May 23, 2025, CWF issued a demand letter to EPA, objecting to the termination because the termination notice failed to provide cognizable reasons for the termination and because the termination was unlawful under the Cooperative Agreement's terms and conditions.

26. On August 29, 2025, CWF informed EPA of its disagreement with the termination and refused to close out the agreement because all work had not been completed.

## HARM TO CWF AND THE COMMUNITIES IT SERVES

27. CWF and the communities it was meant to serve pursuant to the Cooperative Agreement suffered significant harm due to EPA's breach of its Cooperative Agreement.

28. To maintain its capabilities to perform its mission to help people successfully campaign for cleaner air, cleaner and safer water, and protection from toxic pollution, CWF has been required to expend its own funds to retain certain employees whose compensation had been partially covered by the Cooperative Agreement.

29. The alternative would have been to suffer significant disruption in CWF's core mission throughout the United States.

30. Moreover, CWF expended significant amounts in preparing its multi-year Cooperative Agreement application with the expectation that the government could not terminate the agreement unilaterally based on changes in Executive Branch priorities.

31. Further, the communities in Massachusetts and Philadelphia will suffer additional health and safety risk due to lead exposure that might have been abated through performance of the Cooperative Agreement.

## COUNT I – Breach of Contract

32. Plaintiff incorporates by reference the allegations contained in paragraphs 1-31.

33. To recover for breach of contract, Plaintiff must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

34. The Cooperative Agreement is a binding contract that contemplates money damages.

35. EPA officials with authority to bind the United States executed the Cooperative Agreement.

36. EPA breached the express terms of CWF's Cooperative Agreement by wrongfully terminating it.

37. EPA and CWF mutually agreed to limit EPA's unilateral termination rights only to cases where the recipient "fails to comply with the terms and conditions of the award, including statutory or regulatory requirements" or "[p]ursuant to the programmatic terms and conditions specified in the Federal award." The Cooperative Agreement did not allow termination due to shifting Executive Branch priorities.

38. The basis for EPA's termination of the Cooperative Agreement did not assert that CWF failed to comply with the agreement or that the termination was pursuant to any programmatic term or condition specified in the agreement.

39. Instead, EPA unlawfully terminated the Cooperative Agreement, asserting that the "objectives of the award [we]re no longer consistent with EPA funding priorities."

40. This was an impermissible basis for termination, because EPA allowed this basis for termination only prospectively for new grants, after it had executed the Cooperative Agreement.

41. The United States District Court for the District of South Carolina has concluded that guidance under which EPA terminated the entire EJCP, including CWF's Cooperative Agreement, was arbitrary and capricious. *Sustainability Inst.*, No. 2:25-2152-RMG, 2026 WL 1694522, at *5.

42. EPA's breach of CWF's Cooperative Agreement has caused CWF to suffer damages.

43. Under the Award, CWF reasonably expected that it would be able to meet its project goals and objectives. However, as a result of EPA's breach, and the injury suffered from the breach, CWF has been prevented from fulfilling its project goals and objectives as bargained for in entering into the Award.

44. CWF's Proposal and EPA's Award established, with specificity, the purpose, use, and goals of the funding to be provided. Thus, when entering into and issuing the Award, EPA had reason to foresee, and should have reasonably foreseen, that the above-described injury would be a probable result if EPA were to breach the Award.

45. "In breach of contract disputes, injured parties are awarded expectancy damages designed to replicate full performance of the contract. The goal of expectancy damages is to put the non-breaching party in the position it would have occupied but for the breach." *Mentor Graphics Corp. v. EVE-USA, Inc*., 851 F.3d 1275, 1284 (Fed. Cir. 2017); *accord*, *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("A party's expectation interest is the 'interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'") (quoting *Restatement (Second) of Contracts* § 344(a) (1981)).

46. CWF is entitled to receive expectancy damages as compensation for the injury suffered.

47. Expectancy damages here entitle CWF to receive the unpaid portion of the full amount of the award.

48. Furthermore, A plaintiff who has suffered "[a] 'loss caused by reliance on the contract'" is entitled to be compensated for that loss. *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (also quoting *Restatement (Second) of Contracts* § 344(b)).

49. CWF is entitled to recover its out-of-pocket costs incurred in reliance on the RFA, on EPA's selection of CWF to receive a funding grant, and on the consequent Award.

50. CWF devoted substantial time and effort of its workforce in applying for funding under the RFA, particularly in researching and collecting data for CWF's Proposal, drafting the Proposal, and preparing the Proposal for submission to EPA.

51. When EPA then notified CWF that its application for funding had been approved, CWF, as set forth above, undertook substantial time-consuming efforts and incurred significant costs to meet EPA's requirements for receiving an actual award of funding and to begin accomplishing its project goals.

52. After EPA issued the Award on November 14, 2024, CWF continued to devote workforce time and expense to its project goals in reliance on receiving the full amount of funding provided for under the Award, including hiring personnel and incurring other costs.

53. When EPA issued the RFA, selected CWF to receive a funding grant, and issued the Award, EPA, at each such stage, had reason to foresee, and should reasonably have foreseen, that CWF would take the actions described above and incur significant costs and expenses.

54. CWF's expenses and costs, including the monetary time value of its workforce, constitute loss that CWF is entitled to recover as reliance damages by reason of EPA's breach.

55. The amount of these damages is readily calculable.

**COUNT II – Breach of Duty of Good Faith and Fair Dealing**

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1-55.

57. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns*

*v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted).

58. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

59. The Cooperative Agreement is a binding contract that contemplates money damages.

60. EPA officials with authority to bind the United States executed the Cooperative Agreement.

61. The Cooperative Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to the CWF for its Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program projects.

62. CWF entered into the Cooperative Agreement with the reasonable expectation that EPA would comply with the terms of its own Grant Agreements and that EPA would act in good faith and deal fairly with CWF.

63. EPA breached the Cooperative Agreement's implied duty of good faith and fair dealing.

64. EPA breached this implied duty by, among other things, targeting CWF's Cooperative Agreement for unilateral termination based on a rationale that it knew to be unsupported by the agreement's terms and conditions, directing CWF to stop work under the Cooperative Agreement, withdrawing funds already obligated to CWF (without prior notice or

explanation), preventing CWF from spending money already awarded to it, and imposing new terms on CWF.

65. EPA's actions interfered with CWF's performance under the Cooperative Agreement and destroyed CWF's reasonable expectations regarding the fruits of the Cooperative Agreement.

66. Upon information and belief, EPA's actions were intended to interfere with CWF's operation of the EJCP despite EPA knowing that it lacked legal authority to do so.

67. EPA's actions caused CWF to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, CWF respectfully requests that this Court enter judgment against the United States as follows:

i. Awarding money damages to CWF in an amount to be determined at trial;

ii. Awarding any allowable pre- and post-judgment interest;

iii. Awarding CWF its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412, or any other applicable fee shifting provision; and

iv. Granting other such relief as this Court may deem proper.

Date: September 17, 2026

Respectfully submitted,

/s/ Stephen C. Tosini
Law Office of Stephen Tosini
1717 K St. N.W., Rm. 900
Washington, DC 20006
Tel.: (202) 893-0496
E-mail: stephen.tosini@importdefense.com
*Counsel for Plaintiff*